Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/16/2017 09:13 AM CDT

State of Nebraska, appellee, v.
Jaquez B. Clifton, appellant.
___ N.W.2d ___

Filed March 24, 2017.    No. S-15-1167.

1. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Juries: Discrimination: Prosecuting Attorneys: Appeal and Error.** An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory.

3. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.

4. **Juries: Prosecuting Attorneys.** A prosecutor is ordinarily entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his or her view concerning the outcome of the case.

5. **Juries: Discrimination: Prosecuting Attorneys: Proof.** Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process. In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

6. **Juries: Discrimination: Prosecuting Attorneys.** Whether a prosecutor's reasons for using a peremptory challenge are race neutral is a question of law.

7. ____: ____: ____. In determining whether a prosecutor's explanation for using a peremptory challenge is race neutral, a court is not required to reject the explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory.

8. ____: ____: ____. A prosecutor's intuitive assumptions, inarticulable factors, or even hunches can be proper bases for rejecting a potential juror, so long as the reasons are not based on impermissible group bias.

9. **Confessions: Miranda Rights: Police Officers and Sheriffs.** Before the police are under a duty to cease an interrogation, the suspect's invocation of the right to cut off questioning must be unambiguous, unequivocal, or clear.

10. ____: ____: ____. To invoke the right to cut off questioning, the suspect must articulate his or her desire with sufficient clarity such that a reasonable police officer under the circumstances would understand the statement as an invocation of the *Miranda* right to remain silent.

11. **Confessions.** A suspect need not utter a talismanic phrase to invoke his or her right to silence.

12. **Trial: Evidence: Due Process.** The purpose of the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure the disclosure of evidence of such significance that, if suppressed, would deprive the defendant of a fair trial.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Cindy A. Tate, and Mikki C. Jerabek, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Jaquez B. Clifton appeals his convictions for first degree murder and use of a firearm to commit a felony in relation to

the death of Frank Sanders on July 20, 2014. Clifton asserts that the prosecution impermissibly struck prospective jurors on the basis of race and that he should be accorded a new trial under *Batson v. Kentucky*.[1] He further asserts that his statements to law enforcement should have been suppressed as obtained in violation of *Miranda v. Arizona*,[2] because the *Miranda* warning was not given until after the interrogation had begun and because he asserted his right to cut off questioning by saying, "I can't." Lastly, Clifton asserts that the court should have granted a mistrial. He claims the court allowed witness testimony concerning events that the witness had not revealed in prior statements to the police and which were allegedly revealed to the prosecution before trial, but had not been disclosed to the defense as required by *Brady v. Maryland*.[3]

## II. BACKGROUND

### 1. Voir Dire and Clifton's Batson Challenge

At the close of jury selection, defense counsel raised a *Batson* challenge. Although the race or heritage of the venire was not stipulated or otherwise formally put into evidence, defense counsel pointed out during argument before the district court that three of the four African-American jurors in the venire pool were struck by the State's peremptory challenges: prospective jurors Nos. 8, 13, and 14. The prosecution proffered nondiscriminatory reasons for the strikes.

### (a) Juror No. 13

Juror No. 13 was the prosecution's third strike. The prosecutor explained that he did not believe juror No. 13 could be "ultimately independent" and disregard her past experience

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

with drug addiction and alcoholism, including drug transactions that were similar to those that occurred as part of the charges against Clifton.

During voir dire, juror No. 13 stated that she worked full time both as a program specialist with the elderly and as a cook. In her work at an adult daycare, she worked with people with mental health issues. She taught them qualitative living skills. Her second job was a cook for a homeless shelter and the "Hero program." In the late 1980's, she took a class in business law, with the thought of pursuing a career as a legal secretary. She found that legal coursework was not for her. Juror No. 13 was recovering from 25 years of alcoholism and 23 years of crack addiction. She had been sober for 6 years and agreed that many crimes are "fueled by the addiction."

### (b) Juror No. 8

Juror No. 8 was the State's seventh strike. The prosecution was concerned about her experience with the juvenile court and as a therapist who might have sympathy for young offenders like Clifton. The prosecutor noted that juror No. 8 would be aware of the possible penalties at issue in the trial and might resist the punishment demanded by statute, believing that Clifton should be reformed instead.

Juror No. 8 was a mental health therapist, and in that capacity, she was in juvenile court "quite often." She worked with the county attorney's office and the public defender's office in her advocacy of the juveniles or their families. She was subpoenaed "quite often," and she often has to call police officers when she has an unruly or noncompliant child.

Juror No. 8 was friends with two other members of the venire, jurors Nos. 3 and 14. Juror No. 3 ultimately was on the jury panel. With regard to juror No. 3, juror No. 8 said that they "disagree all the time." She knew one of the potential witnesses, whom she described as a friend of her ex-husband and a former coworker.

### (c) Juror No. 14

Juror No. 14 was the prosecution's last strike. The prosecutor explained that he preferred the two other remaining jurors in the venire to juror No. 14, because juror No. 14 did not appear to be forthcoming in volunteering information. Based on a comparison of the answers of juror No. 14 to the answers of the other two remaining jurors, and the fact that the other two remaining jurors appeared younger, the prosecutor had the impression that "if [the other two remaining jurors] were to hear the votes of other people, they wouldn't raise a big ruckus or problem and they would kind of go along to get along." Juror No. 14 worked in sales and was originally from Chicago, Illinois.

Defense counsel generally asserted that Caucasian jurors that were selected had "answers [that] were no more damaging than . . . any of the other potential jurors that were in the pool."

### (d) *Batson* Challenge Denied

The district court found that Clifton had made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race, but found that Clifton had failed to sustain his burden to show that the State's proffered reasons for striking the jurors were a pretext for racial discrimination. Accordingly, the court denied the challenge.

### 2. CLIFTON'S STATEMENTS AND MOTION TO SUPPRESS

Before trial, Clifton moved to suppress all of his statements to law enforcement. Clifton was questioned in custody for approximately 2½ hours. Det. Ryan Davis began the questioning with introductions. At this point, Clifton had not been given *Miranda* warnings.

Clifton spelled his name and gave his address and telephone number. Davis and Clifton discussed Clifton's job status and education. Davis asked Clifton if he knew why he was being questioned. Clifton stated that he did not. Davis explained

that he was doing some followup regarding an incident that occurred on "Sunday," giving the general location of Sanders' residence. Davis asked Clifton if he had any idea what he was talking about. Clifton said he did not, and stated that his mother had passed away some 3 weeks prior and that he was on probation. Further discussion ensued about Davis' probation status and his mother's passing away. When Clifton mentioned he had a son "on the way," Davis inquired about the due date.

Davis proceeded to question Clifton in more detail about his education. When Clifton explained that he did not finish 12th grade because he was "running from different places" and was in the foster care system, Davis asked Clifton further questions about that history. During this time, Clifton did not make any statements regarding the night of July 20, 2014.

After about 5 minutes, Davis read Clifton his *Miranda* rights. After reading Clifton his *Miranda* rights, Davis began asking Clifton questions directly related to the events of July 20, 2014. At first, Clifton denied having left his house that evening. After further questioning, Clifton acknowledged that he was at the address in question on the night in question, but denied pulling the trigger. Clifton said "[s]ome dude . . . wanted to buy some weed"; Clifton claimed he did not know the names of the people he was with and had never seen them before.

Davis asked Clifton to walk him through what happened that night—to tell Clifton's side of the story. Clifton responded that he wanted to talk to his son. Davis stated that he could not facilitate that "right at that second" and continued, "we've come to a point where you've admitted being there, and so I would think you would want to go the one step further and explain what happened so I don't have to listen to everybody else's version of it. Doesn't that make sense?"

Clifton responded, "It do, but I can't tell you." Davis asked why, and Clifton said, "I can't, I just can't." Davis asked, "Did you guys go there to rob him?" Clifton said he did not. Clifton

continued to answer a few more questions about the night in question, and then admitted that "[t]hey" went to Sanders' residence to rob him.

When Davis asked Clifton to tell him who "they" were, Clifton said, "I can't because I don't want anybody telling on me." Davis stated that it was Clifton's future and that it was his opportunity to walk him through this. Clifton responded, "I can't." Davis responded, "Yes, you can." Davis encouraged Clifton to at least tell him who he was with on the night of the shooting. Clifton exclaimed, "Ugh," and when asked if he had wanted "that man to die," Clifton said, "I didn't want that man to die."

Davis explained there was no reason for Clifton to cover for anybody. Clifton stated that while at Sanders' residence, he was told to hold the door open. Clifton said he was holding the front door while another person went to a back room to buy marijuana. He then heard a gunshot and "ran all the way back home."

Clifton continued to refuse to name the other parties. He stated that he was "ready to go, man. I wanna go talk to my kids." When Davis stated that he understood and that they were almost done, Clifton responded, "I ain't got nothing to say, man. I got nothing else to say." After some back and forth, Davis' continued attempts to get Clifton to reveal who was with him the night of the murder, Clifton said he was "ready to leave now" and "I wanna be done." When Davis pressed Clifton again to tell him who was with him, Clifton said he could not talk anymore and stated, "I'm done talking about it. We did enough talking."

The court found through the statements, beginning with "I ain't got nothing to say, man. I got nothing else to say," Clifton had invoked his right to remain silent. It found that any statements following these invocations were inadmissible.

At trial, the jury heard Clifton's admission that he had gone to Sanders' house with two other unknown individuals on the night in question. The jury heard Clifton's statements that he

was holding the door when he heard a gunshot and he "didn't want that man to die."

### 3. OTHER EVIDENCE AT TRIAL

In addition to Clifton's statements to law enforcement made before the point in which the court found he had invoked his right to cut off questioning, the prosecution presented the testimony of Rico Larry; Absalom Scott; Jacklyn Harris, Sanders' live-in girlfriend; neighbors; law enforcement; and forensic experts.

### (a) Jacklyn Harris

Harris lived with Sanders on the main floor of a house which was converted to four separate apartments. She testified that she had hosted a barbeque the afternoon and into the evening of July 20, 2014. Around 10:30 p.m., all the guests had left, and about 11 p.m., she was in the kitchen when Scott knocked on a screen door. She recognized Scott through the glass on the screen door as one of Sanders' regular customers and yelled to Sanders that Scott was there to see him.

Scott and "another guy" entered and walked past her to a back bedroom where Sanders was located. A few seconds later, she heard a gunshot. Immediately thereafter, Scott and another man came running past her and out the front door. Harris testified that Sanders then staggered into the kitchen, where he quickly bled to death. Harris could not find the cell phone she shared with Sanders. She went to her neighbor's apartment for help.

### (b) Sanders' Neighbors' Testimony

Sanders' upstairs neighbor testified that he heard running and looked out his window and saw two men fleeing between two houses. Soon thereafter, Harris knocked on his door, saying that Sanders had been shot and asking to use the telephone. Sanders' downstairs neighbor described that late on July 20, 2014, he heard a scuffling noise, then a momentary quiet, followed by a "boom."

### (c) Absalom Scott

Scott testified that he, Larry, and Clifton went to Sanders' residence on the night of July 20, 2014. Scott stated he and Sanders bought and sold, or traded, drugs to one another. Scott provided crack cocaine, and Sanders provided marijuana. Usually Scott would "just show up," normally accompanied by Larry, and the transactions usually took place in the kitchen or the living room. The transactions did not normally take place in the back bedroom, which was accessed through the kitchen.

On the night of July 20, 2014, Scott and Larry took Clifton to Sanders' residence because Clifton wanted to buy some marijuana. According to Scott, at some point in the evening prior to going to Sanders' house, Clifton had stated that he wanted to rob somebody. Scott testified that he thought Clifton was just "[t]alking crazy" and that he "didn't pay no mind to it." Scott knew that the police were watching Sanders' house, because Scott had participated in several "controlled buys" for the police around that time. As a result, they parked in the alley. Scott testified that Harris opened the door of her residence after they knocked and that they all entered.

Sanders was lying on the couch. Harris went to the kitchen. Scott said that he and Larry sat on the couch with Sanders, while Clifton stood by the front door. Scott informed Sanders that Clifton wished to purchase a pound of marijuana, and upon Sanders' request, Clifton pulled out his purchase money and counted it in front of Sanders. Scott saw Clifton count out approximately $2,500.

Sanders went to the back room, and about 15 seconds later, Scott saw Clifton follow him. Ten seconds after that, Sanders called to Scott to "'[c]ome here.'" Scott got as far as the hallway to the back room, where he found Clifton pointing a gun at Sanders. Scott observed Sanders standing with his hands at his sides, and he heard Sanders ask Clifton, "'What are you doing?'" Scott testified that it did not appear that Sanders had a weapon. Approximately 3 seconds after entering the hallway,

Clifton shot Sanders. Scott saw Sanders fall forward on top of Clifton. Scott said he took off running. Larry and Clifton followed shortly thereafter, and the three drove away.

Scott testified that while they were driving away, Clifton told them that Sanders had reached for Clifton's gun. Scott said that Clifton also threatened him that if he told anyone about the shooting, Clifton would kill Scott and Scott's girlfriend.

The prosecutor asked Scott if he had any contact with Clifton in the days after the shooting and before Scott's arrest. Scott stated the day following the shooting, he had a conversation with Clifton. This testimony led to defense counsel's making a *Brady* objection that will be described in more detail under the subheading entitled "ALLEGED *BRADY* VIOLATION." The *Brady* objection was overruled, and Scott proceeded to testify that the day after the shooting, Clifton told Scott that he and Larry had nothing to worry about because Clifton "did it."

On cross-examination, Scott admitted that on July 20, 2014, he deleted several pictures from his cell phone that depicted him holding a 9-mm semiautomatic weapon. Scott testified that, as a convicted felon, he was not supposed to possess a firearm. He claimed the weapon was not his. Scott admitted that he originally lied to law enforcement about the events in question, stating that two strangers had followed him into the house and shot Sanders while Scott was sitting on the couch.

### (d) Rico Larry

Larry testified he went with Scott and Clifton to Sanders' house the evening of July 20, 2014, to buy some marijuana. He and Scott had visited Sanders many times before for the same purpose. Harris let them into Sanders' residence. Larry stated that he and Scott sat down on the couch next to Harris, while Clifton remained standing. Larry and Scott told Clifton they each wished to buy "a ten bag." Clifton said he wanted to

buy an ounce. Sanders said something about seeing new faces, referring to Clifton, and asked to see the money. Clifton pulled out "a bunch of twenties."

According to Larry, Clifton then followed Sanders to the back room, and Scott followed after Clifton. Larry testified that, soon thereafter, Clifton called out, "'"Come and get it."'" Larry started walking toward the back room. As he did so, he heard "tussling" and then a gunshot. Larry saw Sanders fall on top of Clifton and saw blood. Larry took off running with Scott behind him. Larry heard a loud noise, like Scott had "busted the door."

Larry, Scott, and Clifton entered the vehicle they had driven to Sanders' residence, and left the scene. Larry testified that Clifton told them that he did not know why Larry and Scott were scared, because Clifton was the one who "did the M." Larry explained that to do "the M" is to shoot or kill somebody. According to Larry, Clifton said that he would have shot Sanders more times, but the gun jammed. Larry testified that Clifton threatened him and Scott if they told anyone what had happened.

Larry stated that after Scott drove to a house and left the vehicle to conduct a drug transaction, Clifton "jumped into the driver's seat," and the two of them left. While Clifton was driving, he wiped a cell phone off and threw it out the window. Clifton told Larry that they "ain't gonna be able to call nobody." Larry testified that when Clifton later exited the vehicle, he thought he saw Clifton wearing a gun in his waistband.

### (e) Forensic Evidence

The prosecution adduced forensic evidence that Sanders' blood was found near the rear passenger door handle of the vehicle that Larry, Scott, and Clifton drove to Sanders' residence on July 20, 2014. Sanders' autopsy revealed that Sanders was killed by a single gunshot to the chest. The prosecution presented evidence that the bullet was either a 9 mm

or a .38 caliber. A firearms examiner testified that if it was a 9 mm, a casing would have been ejected after the bullet was fired, unless the gun had jammed. The prosecution presented evidence from law enforcement that no casings were found during the search of Sanders' residence.

### 4. Alleged *Brady* Violation

During Scott's testimony, defense counsel moved to exclude any testimony about his conversation with Clifton the day after the shooting. Counsel alleged the prosecution failed to disclose before trial Scott's statements regarding this conversation. The defense claimed this was a violation of *Brady v. Maryland*.[4] Defense counsel noted that Scott had failed to mention this conversation in his deposition testimony or in his statements to police regarding any conversation with Clifton the day after the murder to the effect that Clifton told Scott that he "did it."

Defense counsel argued that the prosecutor must have known about the alleged conversation, because the prosecutor asked whether any contact was made with Clifton in the days following the shooting. Out of the presence of the jury, defense counsel was permitted to examine Scott concerning any prior mention of the conversation to the prosecution. Scott said he had met with the prosecutor three times. Defense counsel did not inquire in his questioning of Scott about what Scott might have said to the prosecution during those meetings.

Defense counsel did not enter into evidence the prior deposition testimony of Scott, or the police interviews with Scott, wherein Scott reportedly failed to mention this conversation with Clifton. Defense counsel did not ask for a continuance in light of the allegedly late disclosure.

The district court concluded that *Brady* did not apply and that defense counsel was free to cross-examine Scott about his failure to disclose this conversation in his deposition.

---

[4] *Brady v. Maryland, supra* note 3.

During cross-examination before the jury, Scott testified that he could not recall if he had previously reported in his interviews with law enforcement or in his deposition that he had a conversation with Clifton the day after the shooting. But he admitted that he had mentioned it to the prosecution the week of trial.

Defense counsel's motion for mistrial based on the alleged *Brady* violation was overruled.

### 5. Verdict and Sentence

The jury found Clifton guilty of one count of first degree murder and one count of use of a firearm to commit a felony. Clifton was sentenced to life imprisonment for first degree murder and to a consecutive term of 25 to 30 years' imprisonment for use of a firearm to commit a felony. He appeals.

## III. ASSIGNMENTS OF ERROR

Clifton assigns that the district court erred by (1) failing to grant his motion to suppress his statements made to law enforcement, in violation of the constitutional safeguards afforded by *Miranda*; (2) denying Clifton's *Batson* challenge; and (3) denying Clifton's motion for mistrial that alleged a *Brady* violation.

## IV. STANDARD OF REVIEW

[1] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, an appellate court applies a two-part standard of review.[5] Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.[6]

---

[5] *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014).

[6] *Id.*

[2] An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory.[7]

[3] An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.[8]

## V. ANALYSIS

### 1. *Batson* Challenge

[4] We first address whether the district court erred in overruling Clifton's *Batson* challenge to the racial makeup of the jury. A prosecutor is ordinarily entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his or her view concerning the outcome of the case.[9] However, the U.S. Supreme Court in *Batson v. Kentucky* held that the Equal Protection Clause forbids the prosecutor to challenge jurors solely because of their race.[10]

[5] Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process.[11] In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.[12]

First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of

---

[7] *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[8] *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

[9] *Batson v. Kentucky, supra* note 1.

[10] *Id.*

[11] *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012).

[12] See *id.*

race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror.[13] And third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination.[14]

Once the trial court has decided the ultimate question of intentional discrimination, however, the question on appeal is only whether the prosecutor's reasons were facially race-neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous.[15]

[6] Whether a prosecutor's reasons for using a peremptory challenge are race neutral is a question of law.[16] We conclude that the prosecutor's stated reasons for exercising his peremptory strikes were race neutral.

The prosecutor explained he struck juror No. 13 because of concerns she would be unable to set aside her past experience with drug addiction and participation in transactions similar to those surrounding the shooting. He struck juror No. 8 because her experience with juvenile court and as a therapist might give her sympathy for Clifton as a young offender. The prosecutor struck juror No. 14 because, compared to the other two remaining prospective jurors, juror No. 14 seemed the least forthcoming and was the oldest and he might be more likely to cause conflict in the deliberative process.

[7] In determining whether a prosecutor's explanation for using a peremptory challenge is race neutral, a court is not required to reject the explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory.[17] Only inherently discriminatory explanations

---

[13] *Id.*

[14] *Id.*

[15] See *id.*

[16] See *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

[17] See *id.*

are facially invalid.[18] The prosecutor's reasons were not inherently discriminatory.

We turn next to the district court's finding that these race-neutral explanations were not pretexts for discrimination. The third step of the *Batson* inquiry requires the trial court to evaluate the persuasiveness of the justification proffered by the prosecutor; it ultimately determines whether the explanation was pretext for discrimination.[19] A trial court's determination that the prosecutor's race-neutral explanation should be believed frequently involves its evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances.[20]

In determining whether a defendant has established purposeful discrimination in the use of a peremptory challenge, the act of striking jurors of a particular race takes on meaning only when coupled with other information, such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck.[21] "'Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.'"[22]

We find no evidence in the record of any questions or statements during voir dire indicating a discriminatory purpose. And we note that defense counsel failed to make an offer of proof of the racial composition of the venire. But even

---

[18] *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). See, also, *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

[19] See, *Hernandez v. New York, supra* note 18; *State v. Thorpe, supra* note 18; *Jacox v. Pegler*, 266 Neb. 410, 665 N.W.2d 607 (2003).

[20] See *State v. Johnson, supra* note 16.

[21] *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *disapproved on other grounds, State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

[22] *Jacox v. Pegler, supra* note 19, 266 Neb. at 418, 665 N.W.2d at 614 (quoting *Batson v. Kentucky, supra* note 1).

accepting as true defense counsel's assertions as to the race of the venire, we find no reason to conclude that the district court clearly erred in finding that there was no pretext.

In considering a *Batson* challenge, we may consider whether the prosecutor's criterion has a disproportionate impact on a particular race.[23] And in determining whether there is a sufficient pattern of peremptory strikes to support an inference of discrimination, we have recognized the following factors as relevant: (1) whether members of the relevant racial or ethnic group served unchallenged on the jury and whether the striking party struck as many of the relevant racial or ethnic group from the venire as it could, (2) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation in the venire, and (3) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation on the jury.

According to Clifton's factual assertions as to the racial makeup of the venire, one African-American juror served on the jury out of four African-Americans in the venire. Thus, the prosecutor did not strike as many of the relevant racial group from the venire as he could. Indeed, Clifton does not specifically argue that he proved pretext by demonstrating the disproportionate impact of the prosecutor's criterion or a sufficient pattern of peremptory strikes to support an inference of discrimination.

Clifton instead compares the answers of the struck jurors and the nonstruck jurors during voir dire. Clifton argues that answers of the jurors who were struck (and who were African-American) were largely indistinguishable from the nonstruck jurors with respect to the proffered reasons for striking the African-American prospective jurors. If a prosecutor's proffered reason for striking an African-American panelist applies just as well to an otherwise-similar non-African-American

---

[23] See *State v. Thorpe, supra* note 18.

who is permitted to serve, that is evidence to be considered in the third step of the *Batson* analysis.[24]

However, the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges a lawyer has, and a strict comparison analysis may not properly take into account the variety of factors and considerations that may be part of a lawyer's decision to select certain jurors while challenging others that may appear to be similar.[25]

Concerning juror No. 8, Clifton points out other jurors who had experience in the criminal justice system. But, in comparison to juror No. 8, whose experience may have made her more sympathetic to relatively young defendants, the experience of the nonstruck jurors was clearly favorable to the prosecution. The jurors Clifton claims were comparable to juror No. 8 had positive experiences with law enforcement, either having taken classes in criminal justice with a view toward becoming a police officer or volunteering for law enforcement. This is distinguishable from juror No. 8's familiarity as an advocate for her therapy clients in the justice system.

As for juror No. 14, Clifton points to other jurors he believes were not forthcoming. But we find it is impossible to determine from the cold record the extent that juror No. 14's demeanor was more or less forthcoming than the two other remaining prospective jurors at the time the prosecutor used its last peremptory strike for juror No. 14.

Clifton's attack on the prosecutor's race-neutral explanations for striking prospective jurors Nos. 13 and 14 is not based on any explicit comparison to other nonstruck jurors. Instead, it is based upon his assertions that the prosecutor's reasons were illogical, speculative, ignoble, or inconsistent

---

[24] See *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe, supra* note 18. See, also, *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *State v. Starks*, 3 Neb. App. 854, 533 N.W.2d 134 (1995).

[25] *State v. Robinson, supra* note 24.

with the prospective jurors' assurances that they would be impartial. For example, Clifton asserts that allowing the prosecution to strike juror No. 14 because of his apparent "unwillingness to follow the crowd" would make a "mockery" of the voir dire process, which is aimed at finding fair and impartial jurors.[26]

[8] But the question before us is whether the district court clearly erred in finding that the prosecution's race-neutral explanations for their peremptory strikes were genuine and not pretextual. We may consider the rationality of the prosecutor's reasons in our inquiry. As the U.S. Supreme Court explained, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[27] However, "the ultimate inquiry for the [trial court] is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based."[28] A prosecutor's intuitive assumptions, inarticulable factors, or even hunches can be proper bases for rejecting a potential juror, so long as the reasons are not based on impermissible group bias.[29]

We conclude, based on our examination of the record, that the district court did not clearly err in finding the prosecutor's race-neutral explanations for striking African-American jurors were persuasive and that the use of the peremptory challenges was not purposefully discriminatory. In applying this clearly erroneous standard of review, we recognize the pivotal role that the trial court plays in evaluating *Batson* claims. The best evidence of discriminatory intent ""''"often will be the demeanor of

---

[26] Brief for appellant at 38.

[27] *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam).

[28] *U.S. v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). See, also, e.g., *U.S. v. Thompson*, 735 F.3d 291 (5th Cir. 2013); *Taylor v. State*, 279 Ga. 706, 620 S.E.2d 363 (2005).

[29] See, *U.S. v. Thompson, supra* note 28; *People v. Watson*, 43 Cal. 4th 652, 182 P.3d 543, 76 Cal. Rptr. 3d 208 (2008).

the attorney who exercise[d] the challenge."'"[30] Such credibility determinations lie within the peculiar province of the trial judge and, "'"in the absence of exceptional circumstances,"'" require deference to the trial court.[31]

### 2. MOTION TO SUPPRESS

We turn next to Clifton's arguments that his statements to law enforcement should have been suppressed. The court suppressed some of Clifton's statements made after the point at which the court determined Clifton had exercised his right to cut off questioning. Clifton argues that the entirety of his statement should have been deemed involuntary under *Missouri v. Seibert*.[32] Alternatively, Clifton argues that he asserted his right to cut off questioning at a point earlier than that determined by the district court.

### (a) Warnings in Midst of Interrogation

In *Missouri v. Seibert*, the U.S. Supreme Court was confronted with a police "question-first" protocol whereby a suspect was interrogated without *Miranda* warnings until the suspect confessed, after which point, the officer would give *Miranda* warnings, ask for a waiver, and get the suspect to repeat the pre-*Miranda* confession.[33] The Court explained that the underlying assumption with the question-first tactic was that

> with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in

---

[30] *State v. Nave, supra* note 11, 284 Neb. at 487, 821 N.W.2d at 732 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)).

[31] *Id.*

[32] *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

[33] *Id.*, 542 U.S. at 606.

the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.[34]

In the plurality opinion, the Court held that such tactic effectively threatens to thwart the purpose of *Miranda* by reducing the risk that a coerced confession would be admitted.

The Court reaffirmed its holding in *Oregon v. Elstad*,[35] rejecting a blanket "'cat out of the bag'" theory to a voluntary admission obtained in the arguably innocent neglect of *Miranda* at the defendant's home before taking him to the station.[36] The Court rejected the defendant's argument that his subsequent, post-*Miranda* confession at the station house was tainted by the earlier unwarned admission. Instead, the Court found the confession admissible. The Court listed a series of facts that would bear on whether *Miranda* warnings delivered midstream of an interrogation could be effective enough to accomplish their object of presenting a genuine choice to the suspect of whether to follow up on an earlier admission: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.[37]

Subsequently, in *Bobby v. Dixon*,[38] the U.S. Supreme Court addressed a situation where the police decided not to provide the defendant with *Miranda* warnings for fear that he would not speak. In the unwarned interrogation, the defendant

---

[34] *Id.*, 542 U.S. at 613.

[35] *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

[36] *Missouri v. Seibert, supra* note 32, 542 U.S. at 615.

[37] *Id.*

[38] *Bobby v. Dixon*, 565 U.S. 23, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011).

claimed the victim had given him permission to obtain an identification card in the victim's name and endorse a check written out to the victim for the proceeds of the sale of the victim's car. The defendant denied stealing the car and denied knowing the victim's whereabouts. Approximately 4 hours later, another interrogation took place with *Miranda* warnings, after the defendant indicated he wished to talk. In this interrogation, the defendant confessed to murdering the victim and stealing his car.

The Court held that the effectiveness of the *Miranda* warning was not impaired by the sort of two-step interrogation technique condemned in *Seibert*. In addition to pointing out that the time and intervening events precluded a "continuum" of warned and unwarned interrogations, the Court reasoned that "there is no concern here that police gave [the defendant] *Miranda* warnings and then led him to repeat an earlier murder confession, *because there was no earlier confession to repeat*."[39] Nor, the Court pointed out, was there any evidence that police used the defendant's earlier admission of forgery to induce him to waive his right to silence later. The Court distinguished these facts from the facts in *Seibert*, where "the suspect's first, unwarned interrogation left 'little, if anything, of incriminating potential left unsaid,' making it 'unnatural' not to 'repeat at the second stage what had been said before.'"[40]

Thus, essential to a *Miranda* violation under *Seibert* is an inculpatory prewarning statement that somehow overlaps with statements made in the postwarning interrogation. In *State v. DeJong*,[41] we accordingly rejected the defendant's argument that her confession was involuntary because the "'cat was already out of the bag'" when the police induced

---

[39] *Id.*, 565 U.S. at 31 (emphasis supplied).

[40] *Id.* (quoting *Missouri v. Seibert, supra* note 32).

[41] *State v. DeJong, supra* note 5, 287 Neb. at 889, 845 N.W.2d at 878.

admissions after she had invoked her right to cut off questioning. We reasoned that during a subsequent interrogation, she was not explicitly attempting to clarify or explain her previously voiced inadmissible statements.[42] Likewise, in *State v. Juranek*,[43] we held that the defendant's post-*Miranda* statement was voluntary despite a pre-*Miranda* admission, because we could not say that "the pre-*Miranda* interrogation left little to be said." We noted that the pre-*Miranda* questioning had not touched upon key points in the investigation, which we found distinguishable from *Seibert*, where there was a "systematic, exhaustive" pre-*Miranda* interrogation, "'little, if anything, of incriminating potential left unsaid,'"[44] and a post-*Miranda* interrogation that "'cover[ed] the same ground a second time.'"[45]

Clifton focuses on the continuum between the unwarned and warned questioning and the number of questions presented before *Miranda* warnings were given. He ignores the fact that the pre-*Miranda* questioning was not intended to induce inculpatory statements by the defendant. In the 5 minutes of pre-*Miranda* questioning at issue, the questions concerned the correct spelling of Clifton's name and other information such as his address, job status, and educational background. During this time, Davis also expressed his condolences for Clifton's recent loss of his mother and inquired about the upcoming birth of Clifton's child. "Interrogation" for purposes of *Miranda* includes "'either express questioning or its functional equivalent.'"[46] The functional equivalent of express questioning refers to "any words or actions on the part of the police

---

[42] See *State v. DeJong, supra* note 5.

[43] *State v. Juranek*, 287 Neb. 846, 860, 844 N.W.2d 791, 804 (2014).

[44] *Id*. at 860, 844 N.W.2d at 803.

[45] *Id.* at 858, 844 N.W.2d at 802.

[46] *Rhode Island v. Innis*, 446 U.S. 291, 309, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[47] The only pre-*Miranda* question Davis asked that was reasonably likely to elicit an incriminating response was whether Clifton knew why he was being questioned. As in *Juranek*, there was in this pre-*Miranda* questioning much ground left to be covered.

Most importantly, Clifton also ignores the fact that he gave no incriminating statements before being given *Miranda* warnings. In no manner was Clifton repeating at the second stage what had been said before. Due to the nature of the pre-*Miranda* questioning, Clifton had revealed nothing in relation to Sanders' death during that stage of questioning.

The concerns with the two-step interrogation technique condemned in *Seibert* are simply not present under these facts. The district court did not err in denying Clifton's motion to suppress on the ground that the entirety of Clifton's statement was involuntary under *Seibert*.

### (b) Cutting Off Questioning

Alternatively, Clifton argues that the district court erred in failing to determine that he asserted his right to cut off questioning at an earlier point of the interrogation, when he said, "I can't," "I can't, I just can't." Clifton argues that the court should have suppressed his statements indicating that the other people he was with on July 20, 2014, went to Sanders' residence to rob him, Clifton held the front door while the others went to the back room, and Clifton did not want Sanders to die.

The safeguards of *Miranda* """"assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.""""[48] If the suspect

---

[47] *Id*., 446 U.S. at 301.

[48] *State v. DeJong, supra* note 5, 287 Neb. at 883, 845 N.W.2d at 874.

indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.[49] The right to choose between speech and silence derives from the privilege against self-incrimination.[50]

[9,10] Before the police are under a duty to cease the interrogation, however, the suspect's invocation of the right to cut off questioning must be "'unambiguous,' 'unequivocal,' or 'clear.'"[51] This requirement of an unequivocal invocation prevents the creation of a "'third layer of prophylaxis'" which could transform the prophylactic rules of *Miranda* """into wholly irrational obstacles to legitimate police investigative activity."'"[52] To invoke the right to cut off questioning, the suspect must articulate his or her desire with sufficient clarity such that a reasonable police officer under the circumstances would understand the statement as an invocation of the *Miranda* right to remain silent.[53]

If the suspect's statement is not an "'unambiguous or unequivocal'" assertion of the right to remain silent, then there is nothing to "'scrupulously honor'" and the officers have no obligation to stop questioning.[54] Officers should not have to guess when a suspect has changed his or her mind and wishes the questioning to end, nor are they required to clarify ambiguous remarks.[55] They are not required to accept as conclusive

---

[49] *State v. DeJong, supra* note 5.

[50] See, *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); *Miranda v. Arizona, supra* note 2.

[51] *State v. Rogers*, 277 Neb. 37, 58, 760 N.W.2d 35, 64 (2009). See, also, e.g., *Berghuis v. Thompkins, supra* note 50.

[52] *State v. Rogers, supra* note 51, 277 Neb. at 52, 760 N.W.2d at 51.

[53] *Id.*

[54] *Id*. at 52, 760 N.W.2d at 50.

[55] See *State v. Rogers, supra* note 51. See, also, *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

any statement or act, no matter how ambiguous, as a sign that a suspect desires to cut off questioning.[56]

[11] In considering whether a suspect has clearly invoked the right to cut off questioning, we review not only the words of the criminal defendant, but also the context of the invocation.[57] A suspect need not utter a "'talismanic phrase'" to invoke his or her right to silence.[58] Relevant facts include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.[59] A court might also consider the questions that drew the statement, as well as the officer's response to the statement.[60]

We agree with the district court that a reasonable police officer would not have understood Clifton's statement that "I can't" as an invocation of the right to remain silent. Clifton indicated that it made sense to tell his side of the story, because he had already admitted being in Sanders' residence during the shooting, "but I can't tell you." When Davis asked for clarification, Clifton simply said, "I can't, I just can't." But Clifton then started answering questions about the night in question, elaborating that "[t]hey" went to Sanders' residence to rob him. When asked who "they" were, Clifton explained why he could not tell who the other parties were: "I can't because I don't want anybody telling on me."

In similar circumstances, courts have held that the statement, "I can't" is not an unambiguous invocation of the

---

[56] *Id.*

[57] *Id.*

[58] *Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010).

[59] *State v. DeJong, supra* note 5.

[60] *Id.*

right to remain silent.[61] Rather, the suspect has thereby indicated a temporary physical or emotional incapacity, or a fear of reprisal by cohorts.[62] Such motivations will not render an unambiguous expression of a desire to remain silent ambiguous,[63] but expressions of these emotions often are something less than a clear invocation of the right not to incriminate oneself.

Such was the case here. Clifton's first ambiguous expression of "I can't" must be viewed in light of his simultaneous affirmation that it made sense to tell his side of the story. And after again saying simply "I can't," upon Davis' request for clarification, Clifton readily answered questions relating to the night in question, again indicating he was not invoking his right to cut off questioning. Clifton's last indication of "I can't" was specifically directed to his unwillingness to identify his cohorts. Thus, it did not indicate an unwillingness to answer other questions relating to the shooting; i.e., to cut off all questioning. We find no error in the district court's denial of Clifton's motion to suppress the statements made after saying, "I can't."

### 3. Alleged *Brady* Violation

Lastly, Clifton asserts that the district court should have granted his motion for mistrial based on the alleged *Brady* violation of failing to disclose Scott's recent addition to his story of the night in question, which Scott allegedly had shared with State attorneys the week before trial. At issue is Scott's testimony that the day after the shooting, Clifton told

---

[61] See, *Taylor v. Riddle*, 563 F.2d 133 (4th Cir. 1977); *U.S. v. Sanchez*, 866 F. Supp. 1542 (D. Kan. 1994); *Braddy v. State*, 111 So. 3d 810 (Fla. 2012); *Williams v. State*, 290 Ga. 418, 721 S.E.2d 883 (2012); *Weaver v. State*, 288 Ga. 540, 705 S.E.2d 627 (2011); *Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App. 1996). Compare, *Hurd v. Terhune, supra* note 58; *State v. Diaz-Bridges*, 208 N.J. 544, 34 A.3d 748 (2012).

[62] See, generally, *id*.

[63] See, e.g., *McGraw v. Holland*, 257 F.3d 513 (6th Cir. 2001).

him he "did it." Clifton argues that earlier disclosure of this conversation would have enabled defense counsel to better prepare to cross-examine Scott. Clifton asserts that his alleged inculpatory statement to Scott was impeachment evidence, because the veracity of that statement could be questioned on the ground of its late disclosure. Clifton asserts that, as impeachment evidence, the statement was information favorable to the accused as defined by *Brady v. Maryland*[64] and *United States v. Bagley*.[65]

[12] In *Brady v. Maryland*, the U.S. Supreme Court laid down the principle that irrespective of the good or bad faith of the prosecution, its suppression of evidence favorable to an accused violates due process if the evidence is material to either guilt or punishment.[66] The purpose of the *Brady* rule is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure the disclosure of evidence of such significance that, if suppressed, would deprive the defendant of a fair trial.[67] As refined by subsequent case law, there are three components to a *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued such that there is a reasonable probability that the suppressed evidence would have produced a different verdict; i.e., the suppressed evidence must be "'material either to guilt or to punishment.'"[68]

---

[64] *Brady v. Maryland, supra* note 3.

[65] *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

[66] *Brady v. Maryland, supra* note 3. See, also, *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

[67] See *United States v. Bagley, supra* note 65.

[68] See *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting *Brady v. Maryland, supra* note 3). Accord *United States v. Bagley, supra* note 65.

As Clifton points out, the U.S. Supreme Court's decision in *United States v. Bagley* clarified that there is no distinction between impeachment evidence and exculpatory evidence. Evidence that might be used to impeach the prosecution's witnesses is "'"'evidence favorable to the accused" [because] if disclosed and used effectively, it may make the difference between conviction and acquittal.'"[69]

In *Bagley*, the government had disclosed affidavits from key witnesses attesting that their statements were given without any consideration from the government, but the defendant later discovered the witnesses in question were paid for providing information and testifying against him. The Court found that the misleading affidavits affected defense counsel's ability to impeach key witnesses. Thus, the Court remanded the cause for a determination of whether there was a reasonable probability that had the inducements been disclosed to the defense, the result of the trial would have been different.

Before looking at the effect at trial of the nondisclosure, we consider the nature of the evidence itself.[70] The statement by Clifton that he "did it" was inculpatory, not exculpatory. Nor was Scott's late revelation of Clifton's inculpatory statement impeachment evidence. The impeachment here at issue is "'impeachment by omission,'" where "'"[a] former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement . . . .'"'[71] In such circumstances, "'"the prior statement is [considered] sufficiently inconsistent" to be admitted

---

[69] *State v. Lotter*, 255 Neb. 456, 487, 586 N.W.2d 591, 617 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999) (quoting *United States v. Bagley, supra* note 65, and *Brady v. Maryland, supra* note 3).

[70] See *U.S. v. Gonzales*, 90 F.3d 1363 (8th Cir. 1996).

[71] *U.S. v. Useni*, 516 F.3d 634, 651 n.13 (7th Cir. 2008). See, also, e.g., Steven Lubet, *Understanding Impeachment*, 15 Am. J. Trial Advoc. 483 (1992).

to impeach the present testimony.'"[72] The impeachment evidence is Scott's deposition testimony and statements to police wherein he failed to mention the conversation that Clifton allegedly had with Scott the day after the shooting. And these prior statements were disclosed to defense counsel.

Furthermore, we have repeatedly held that where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated.[73] Scott's testimony was disclosed at trial, and defense counsel was given an opportunity to cross-examine Scott about whether he had previously disclosed Clifton's statement that he "did it." In the event that defense counsel believed more time was required to adequately prepare for cross-examination, a continuance could have been requested. It was not.

In sum, Scott's revelation to the prosecution that Clifton told him the day after the shooting he "did it" was not impeachment evidence. Regardless, the evidence was disclosed at trial. We conclude, therefore, that there was no *Brady* violation. The district court did not abuse its discretion in denying defense counsel's motion for mistrial.

## VI. CONCLUSION

Having found no merit to Clifton's *Batson*, *Miranda*, or *Brady* challenges, we affirm the judgment below.

AFFIRMED.

---

[72] *U.S. v. Useni, supra* note 71, 516 F.3d at 651 n.13.

[73] See, *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016); *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004); *State v. Lotter, supra* note 69. See, also, *U.S. v. Gonzales, supra* note 70.