Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/06/2018 08:11 AM CST

STATE OF NEBRASKA, APPELLEE, V.
ANDREW D. WILLIAMS, APPELLANT.

___ N.W.2d ___

Filed October 30, 2018.    No. A-17-877.

1. **Criminal Law: Pretrial Procedure.** Discovery in a criminal case is
   generally controlled by either a statute or court rule.
2. ____: ____. Neb. Rev. Stat. §§ 29-1912 and 29-1913 (Reissue 2016) set
   forth specific categories of information possessed by the State which are
   discoverable by a defendant.
3. ____: ____. Neb. Rev. Stat. § 29-1916 (Reissue 2016) provides only
   reciprocal discovery to the State as to orders for discovery entered pur-
   suant to Neb. Rev. Stat. §§ 29-1912 and 29-1913 (Reissue 2016).
4. ____: ____. A motion for deposition is filed pursuant to Neb. Rev. Stat.
   § 29-1917 (Reissue 2016). However, unlike general discovery, a motion
   for deposition can be filed by either party to a criminal case.
5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings
   under the residual hearsay exception, an appellate court reviews for
   clear error the factual findings underpinning a trial court's hearsay rul-
   ing and reviews de novo the court's ultimate determination to admit
   evidence over a hearsay objection.
6. **Rules of Evidence: Hearsay: Proof.** Hearsay is an out-of-court state-
   ment made by a human declarant that is offered in evidence to prove the
   truth of the matter asserted.
7. **Rules of Evidence: Hearsay.** Generally, hearsay is inadmissible except
   as provided by a recognized exception to the rule against hearsay.
8. **Trial: Evidence: Testimony: Proof.** Demonstrative exhibits are admis-
   sible if they supplement a witness' spoken description of the transpired
   event, clarify some issue in the case, and are more probative than
   prejudicial.
9. **Trial: Evidence.** Demonstrative exhibits are inadmissible when they do
   not illustrate or make clearer some issue in the case.

10. **Trial: Judges: Juries: Evidence.** A trial judge may exercise his or her broad discretion to allow or disallow the use of demonstrative exhibits during jury deliberations.

11. **Convictions: Evidence: Appeal and Error.** Even if admitted in error, where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

12. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

13. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

14. **Hearsay.** If an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay.

15. **Trial: Hearsay.** A trial court should identify the specific nonhearsay purpose for which the making of a statement is relevant and probative.

16. **Trial: Appeal and Error.** An error is harmless when cumulative of other properly admitted evidence.

17. **Trial: Jurors.** Retention or rejection of a juror is a matter of discretion with the trial court.

18. **Trial: Motions to Dismiss: Jurors: Appeal and Error.** The standard of review in a case involving a motion to dismiss a juror is whether the trial court abused its discretion.

19. **Juror Qualifications.** Through the use of peremptory challenges or challenges for cause, parties can secure an impartial jury and avoid including disqualified persons.

20. ____. Jurors who form or express opinions regarding an accused's guilt based on witness accounts of the crime must be excused for cause. However, jurors whose source of information is from newspaper reports, hearsay, or rumor can be retained if the court is satisfied that such juror can render an impartial verdict based upon the law and the evidence adduced.

21. **Jurors: Appeal and Error.** The erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges.

22. **Motions to Strike: Jurors: Appeal and Error.** Appellate courts ought to defer to the trial court's judgment on a motion to strike for cause, because trial courts are in the best position to assess the venire's demeanor.

23. **Jurors: Proof: Appeal and Error.** The complaining party must prove it used all its peremptory challenges and would have used a challenge to remove other biased jurors if not for the court's error.

24. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

25. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law which an appellate court reviews independently of the trial court's determination.

26. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

27. **Motions to Suppress: Courts: Records.** District courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress.

28. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures.

29. **Arrests: Search and Seizure: Probable Cause.** An arrest constitutes a seizure that must be justified by probable cause to believe that a suspect has committed or is committing a crime.

30. **Criminal Law: Warrantless Searches: Probable Cause.** Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances.

31. **Probable Cause: Appeal and Error.** An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.

32. **Miranda Rights.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), adopted a set of safeguards to protect suspects during modern custodial interrogations.

33. **Constitutional Law: Arrests: Miranda Rights: Words and Phrases.** A person is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when formally arrested or otherwise restrained so as to be unable to move freely. It is undisputed that a person who is handcuffed and placed in a police cruiser's back seat is in custody.

34. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** An interrogation includes express questioning, its functional equivalent, and any police conduct that police officers ought to know is reasonably likely to elicit incriminating responses. An arrestee's voluntary statements, which are not the product of interrogation, are not protected under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

35. **Miranda Rights: Self-Incrimination.** When a custodial interrogation occurs in the absence of *Miranda*-style procedural safeguards, an arrestee's self-incriminating statements are inadmissible in court.

36. **Criminal Law: Confessions: Appeal and Error.** In determining whether the State has shown the admissibility of custodial statements by the requisite degree of proof, an appellate court will accept the factual determination and credibility choices made by the trial judge unless they are clearly erroneous and, in doing so, will look to the totality of the circumstances.

37. **Trial: Evidence: Juries: Appeal and Error.** Erroneous admission of evidence is a harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. The proper inquiry is whether the trier of fact's verdict was certainly not attributable to the error.

38. **Miranda Rights: Arrests: Self-Incrimination.** Courts must consider whether a *Miranda* warning, when given after an arrestee has already made incriminating statements, is sufficient to advise and convey that the arrestee may choose to stop talking even though he or she has spoken before the warning was administered.

39. **Miranda Rights.** The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function effectively as *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), requires.

40. **Miranda Rights: Evidence.** To determine whether a midinterrogation *Miranda* warning is sufficient to warrant the admission of post-*Miranda* statements, courts should consider five factors: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

41. **Miranda Rights.** In instances of midinterrogation *Miranda* warnings, violations must include an inculpatory prewarning statement that somehow overlaps with statements made in the postwarning interrogation.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Bell Island, of Island Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Andrew D. Williams appeals from his convictions after a jury trial in the district court for Douglas County of two counts of driving under the influence causing serious bodily injury. On appeal, he argues the court erred in rulings regarding evidentiary issues, excusing a prospective juror for cause, and denying pretrial motions to suppress. For the reasons set forth below, we affirm.

## II. BACKGROUND

### 1. ACCIDENT

On the evening of February 26, 2016, Williams' pickup truck collided with a car near the intersection of 52d and Parker Streets in Omaha, Nebraska. Kyle Phillips, Erin Sorenson, and Nathaniel Wissink were in the car when it was hit.

Phillips, who testified that he drives through the area on a near-daily basis, described 52d and Parker Streets as a T-intersection in which a driver on Parker Street faces uphill. From this perspective, a driver has a clear line of sight to the right, or north, but when looking to the left, or south, on 52d Street, can see for only a block or block and a half as a hill crests when 52d Street intersects near Decatur Street. Accordingly, Phillips testified that oncoming cars traveling on 52d Street from the south would not be visible from the intersection in question until the hill's crest.

On February 26, 2016, Phillips was accompanied by Wissink in the front passenger seat and Sorenson in the rear passenger seat as he drove westbound on Parker Street up the hill. Phillips testified that it was dark at about 6:45 or 7 p.m. when he stopped at the stop sign at the intersection of 52d and Parker Streets. After seeing no cars approaching from the left or the right, he pulled into the intersection and began to turn left when his car was "struck just . . . so fast that there was no time to comprehend anything" from the left while approximately halfway in the intersection.

During trial, the State elicited testimony from a number of neighbors who heard the accident and quickly arrived at the scene. Andrew Hale was sitting in his home on 52d Street and heard a vehicle approaching from the south at "what [he] thought would be a high rate of speed." The vehicle accelerated without stopping, sounding as if "somebody had pushed on the gas pedal." Hale testified that the vehicle continued accelerating until he heard a crash a few seconds after it passed his house. At no point did Hale hear the vehicle brake. When Hale got outside and saw there had been a crash, he called the 911 emergency dispatch service and spoke to the dispatcher.

Brett Bailes, who lived at the corner of 52d and Parker Streets, testified that he felt an explosion that shook his front door and saw a fireball go up into the trees. He ran outside and up to the car and immediately encountered Sorenson, who

had come out of the car and was engulfed in flames. Bailes took off his hooded sweatshirt, put it over her, and tackled her to the ground in order to smother out the flames with his body.

Bailes testified that once the flames engulfing Sorenson were extinguished, he noticed that Sorenson's face had significant burns and that much of her hair was gone. He further described that the jacket and jeans she was wearing appeared to be "melted into her skin": "You couldn't tell where skin and where clothing stopped and started." Bailes next noticed that Phillips, who was limply hanging out the car and beginning to regain consciousness, was being helped out of the car by another neighbor who lived on Parker Street and went outside after hearing "a very large, loud sound, kind of indescribable, extremely-violent-and-loud-explosion kind of a sound" and seeing a vehicle in flames.

Sorenson indicated there had been three people in the car, so Bailes and two neighbors ran back to the car that was completely engulfed in flames and found Wissink unconscious in the front passenger seat. Bailes testified that the car was split in half and appeared to be melting by that point; the front passenger door was "creased in" and would not open.

The three neighbors attempted to extricate Wissink from the car but struggled because his leg was pinned by the door and dashboard. Bailes said the back of Wissink's jeans were on fire and were "melting to him" by that point. Eventually, Bailes leaned in through the driver's window and freed Wissink's leg, enabling his two neighbors to pull Wissink out the front passenger window. Wissink remained unconscious when they laid him in the yard beside Sorenson and Phillips. Paramedic firefighters arrived shortly thereafter.

Bailes and one of the neighbors ran toward the pickup truck, which was near 52d and Blondo Streets, to see if anyone needed help. No one was in the pickup truck, however, and Bailes said he saw no one around who may have been the driver. Bailes testified that he observed "a plethora of beer cans

of Bud Light cans and Budweiser cans all along the street." He never saw anyone associated with the pickup truck.

On cross-examination, Bailes said that "you can see [south] one and a half or two blocks" from the intersection of 52d and Parker Streets. He also estimated that there were probably 12 to 15 beer cans in the street.

Jason Orduna, a paramedic firefighter, testified that he rode in the first vehicle out of the station, an ambulance, and that he could see the fiery car from approximately six blocks away. Various bystanders and neighbors had assembled by the time he arrived at the scene and directed him to the victims in the nearby yard. After speaking with Sorenson and briefly examining her wounds and also conversing with Gregory Hladik, another paramedic firefighter, Orduna determined that Sorenson was the most critically wounded victim. Hladik also testified that Sorenson was more severely injured than Phillips. As Orduna treated Sorenson, Hladik treated Phillips. Together, they transported Sorenson and Phillips via ambulance to a medical center, arriving there at 7:41 p.m. Upon arrival at the medical center, Orduna and Hladik transferred care to the medical center personnel.

Omaha Police Department officers, Mark Blice and Grant Gentile, were dispatched to the scene as well. They first observed a pickup truck on its side about a block away from a car that was engulfed in flames and virtually split in half. They also observed several unopened beer cans and ice in the road along with coolers in the back of the pickup truck. After ensuring no occupants remained in either vehicle, Blice and Gentile began separately speaking with potential witnesses who had gathered near the scene.

Witnesses told Blice that they observed the pickup truck driver exit his vehicle and walk away. They described the pickup truck driver as a white man who had short hair and wore blue jeans. As Blice continued speaking with witnesses, they identified a man walking around behind him as the pickup truck driver. That man was thereafter identified as Williams.

Blice made contact with Williams and observed that he appeared disoriented, smelled of alcohol, and exhibited slurred speech and watery eyes. When Blice asked Williams if he was the pickup truck driver, Williams confirmed that he was. Williams also matched the physical description given by witnesses. Blice then handcuffed Williams and placed him in the back seat of his police cruiser.

Without first administering a *Miranda* warning, Blice proceeded to briefly question Williams. In particular, Blice asked Williams what had happened, where he was going, and what he was doing when the accident occurred. Williams answered that he was traveling northbound on 52d Street when someone pulled out in front of him. Williams told Blice that he was unable to stop before hitting the car, and he acknowledged that he was traveling too fast.

Contemporaneous with Blice's speaking to witnesses and locating Williams, Gentile spoke with the victims who were being treated in a nearby yard prior to transport. Later medical examinations and treatment showed that Sorenson suffered second degree burns to her face and hands, a lung contusion, a small collapse of her lung, multiple broken ribs, and a ruptured spleen. Phillips sustained a cervical spine fracture near his lower neck or upper back. Meanwhile, Wissink suffered a concussion and a "bone dent" to his right femur.

After speaking with the three victims, Gentile approached Williams, who was at that time handcuffed and seated in the back of the police cruiser. Gentile asked Williams whether he was injured or needed medical attention, which Williams declined. During their conversation, Gentile noticed the strong odor of alcoholic beverage on Williams' person and further observed that his speech was thick and slurred.

## 2. Jail Transport

Blice and Gentile transported Williams to the police station. While transporting Williams, Blice asked him for the information of an emergency contact person as was Blice's routine

procedure while transporting someone. Williams provided the name and telephone number of his wife. Records show that Williams entered the police station at approximately 8:15 p.m. on February 26, 2016. Upon arrival, Blice and Gentile took Williams into a room designated for breath testing and read him a "Post Arrest Chemical Test Advisement," which advised Williams he had been arrested for driving under the influence and requested that he submit to a breath test. Blice also began observing Williams as part of the test and readied paperwork, including a driving under the influence supplementary report and field notes, which includes a *Miranda* rights advisory. Williams agreed to answer questions after being read the advisory.

Blice asked Williams whether he was driving, had been drinking earlier, and felt his drinking impaired his driving. Williams responded affirmatively to each question. When Blice asked Williams what signs of intoxication he thought he presented, Williams responded, "too many beers." Blice then asked about where Williams was going ("home") and from where he was coming ("work"). Williams articulated an understanding of where he was traveling and knew roughly what time it was.

Upon being asked, Williams acknowledged he had six beers at work from around 3 to 6:45 p.m. Williams again confirmed he was not injured. Blice ended the interview around 8:39 p.m. by asking whether there was anything else Williams would like documented. Williams said he noticed beer cans on the street and wanted it documented that those did not belong to him. Thereafter, Williams was administered a breath test via a DataMaster machine and registered a score of .134.

Blice testified that he continued noticing signs of Williams' intoxication throughout the time he transported him to the police station and interviewed him. In particular, Williams' "thick speech" and watery eyes persisted, as did the odor of alcoholic beverage. Based on his observations throughout the

day, Blice opined that Williams was under the influence of alcohol to an extent that it impaired his driving.

On cross-examination, Blice acknowledged that Williams did not exhibit many other factors indicating intoxication. Williams was not unsteady or swaying while he walked. He was cooperative in answering questions and respectful toward officers. Blice also acknowledged that he did not perform standard field sobriety tests on Williams. This was due, in part, to Blice's concern that the results might be affected by any injuries Williams sustained in the accident.

While at the police station, Williams made eight separate telephone calls, all to the same telephone number, which was later identified as belonging to his wife. Not all of the calls were completed or lasted very long, however. The telephone call system begins with an automated voice that advises the call is subject to being monitored and recorded. Williams' first call occurred around 11:30 p.m. During the calls, the couple discussed the accident in general terms, his intoxication level, the charges, the victims' conditions, bond, and whether he would be in jail over the weekend. Williams also told his wife he had been driving over the speed limit and was driving recklessly.

### 3. Pretrial

Williams was charged with two counts of driving under the influence causing serious bodily injury, each being a Class IIIA felony. Williams entered pleas of not guilty.

Before this matter proceeded to trial, Williams filed a series of motions to suppress. In his first two motions, Williams alleged that officers collected evidence from him following his arrest made without a warrant and without probable cause, thus violating his constitutional protections under the Fourth Amendment. He also alleged that any statements taken from him should be suppressed as a product of an illegal arrest and because he did not knowingly and intelligently waive his *Miranda* rights.

The court received testimony from Blice and Gentile and a Douglas County "911 audio tech." The court denied Williams' motion to suppress by an order dated November 1, 2016, finding the officers' actions did not violate Williams' constitutional rights. The court found the officers had probable cause to arrest Williams and "take the actions they did" thereafter.

On May 25, 2017, Williams filed a "Motion in Limine/ Motion to Suppress" results of the breath test administered upon his arrest. On the same date, he filed a motion in limine to prevent the State from making any mention of (1) statements he made at the jail and (2) a written report which stated that the DataMaster machine was in proper working order at the time he was tested. The State filed a motion in limine seeking to prohibit Williams from calling an identified expert witness to testify. The court heard these motions on June 9 and denied Williams' motions by orders filed June 13. As to the State's motion, the district court required Williams to make disclosures to the State regarding Robert Belloto, Jr., an expert witness who would testify regarding issues with the DataMaster machine.

## 4. Trial

This matter then proceeded to a jury trial, which was held June 19 through 23, 2017. During trial, the State called 23 witnesses, which included Blice and Gentile, other emergency responders, other law enforcement personnel, the jail's telephone system administrator, an accident reconstructionist, the three victims, the victims' treating physicians, and various neighbors and bystanders from the accident scene. Williams called one witness, Belloto.

During trial, Blice and Gentile described their observations of the accident scene and Williams, and they detailed their conversations and questioning of Williams. Emergency responders and other law enforcement personnel likewise described the accident scene, and paramedic firefighters discussed the victims' injuries. The victims' treating physicians further detailed

the victims' particular injuries. Other law enforcement personnel and the jail's telephone system administrator described their observations of Williams while he was at the police station, which aligned with Blice's and Gentile's descriptions.

The State's accident reconstruction expert was Richard Ruth, who specialized in the use of "automobile event data recorders" to understand the manner in which a vehicle operated just before a crash. Ruth testified regarding the information that is captured by an "air bag control module" and an "event data recorder," and he also performed calculations of speed based on "inline momentum analysis" and "postcrash travel." In particular, he analyzed the data provided by the data recorder from Williams' pickup truck.

Based on all of the information available to him, Ruth testified that Williams was traveling between 63.1 and 78.6 miles per hour at the time of impact. The data recorder revealed that the accelerator of the pickup truck was depressed almost to the maximum until 2.4 seconds prior to impact. Williams' accelerator pedal was released, and the brake applied between 2.4 and 1.4 seconds before impact. Ruth estimated that the pickup truck would have slowed down by approximately 18 miles per hour between the application of the brakes and impact. Williams' pickup truck traveled for 246 feet after the crash impact. A number of Ruth's calculations and summaries were received, including exhibits 139 through 141, 143 through 147, and 150.

Later, during Williams' case in chief, he called Belloto, a pharmacist who has expertise related to the DataMaster machine. Belloto reviewed records and repair reports related to the DataMaster machine used to test Williams' breath. He said that multiple breath tests ought to be administered to the same person in order to avoid false positives caused by gastric reflux, breath spray that contains alcohol, radio interference, or the machine beginning to fail.

Belloto testified about his concerns with the DataMaster machine used to test Williams because there was no indication

that Williams' test was "bookend[ed]" by tests of known substances that would show the machine was still working properly. Moreover, Belloto was concerned with the machine's multiple repairs and eventual replacement. Belloto was further concerned that Williams' blow was unusually long at 50 seconds because longer blows into the machine cause a "spike" and registers higher scores. During cross-examination, however, Belloto acknowledged that Williams' breath test result was a .12 after 15 seconds of blowing and only increased to .134 by the end of his 50-second blow.

Following Belloto's testimony, Williams rested, and the State offered no rebuttal evidence. The jury thereafter returned guilty verdicts on both counts of driving under the influence causing serious bodily injury. Williams was sentenced to 3 years' imprisonment on count 1 and 2 years' imprisonment on count 2. Additionally, Williams was sentenced to 9 months' postrelease supervision with regard to each conviction, and Williams' driver's license was revoked for 3 years with regard to each conviction. The sentences were ordered to run consecutive to each other.

Williams appeals.

## III. ASSIGNMENTS OF ERROR

Williams assigns, restated and renumbered, that the district court erred in (1) ordering him to disclose the opinions, facts, and data of Belloto, an expert witness; (2) admitting the opinions and summaries of a State's expert over objection; (3) admitting jailhouse telephone calls over objection; (4) not striking a prospective juror for cause; and (5) denying his motions to suppress his arrest and the statements he gave before and after receiving a *Miranda* warning.

## IV. ANALYSIS

### 1. Disclosure of Expert Opinion

Williams first assigns that the district court erred by sustaining in part a motion in limine filed by the State seeking

to preclude Williams from calling Belloto as a witness. At the hearing on the motion, the prosecutor alleged that shortly before the scheduled trial, he was provided a copy of Belloto's resume by defense counsel. The prosecutor then contacted one of Williams' attorneys and asked whether Belloto would testify and if so, whether a report of his opinions would be forthcoming. According to the prosecutor, he was told that no report existed to date. As such, the motion was filed seeking an order that would preclude Belloto from testifying or, in the alternative, require Williams to disclose the underlying facts and data supporting any opinions he might give. The district court sustained the motion in part, requiring Williams to either provide the State a copy of any report prepared by Belloto, make Belloto available for inquiry or deposition, or provide a written narrative report that contained a complete explanation of Belloto's substantive testimony. On June 15, 2017, defense counsel provided the State a one-paragraph letter which identified the topics that Belloto would testify about and the materials upon which his testimony would be based. The letter does not provide any information on what opinions or conclusions Belloto would include in his testimony. The State argues the court did not err in requiring Williams to provide the ordered information regarding Belloto's expected testimony. Alternatively, the State argues that if the district court erred in its requirements, such error was harmless. Finding no error by the district court, we affirm.

[1,2] Discovery in a criminal case is generally controlled by either a statute or court rule. *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014). Neb. Rev. Stat. §§ 29-1912 and 29-1913 (Reissue 2016) set forth specific categories of information possessed by the State which are discoverable by a defendant. Neb. Rev. Stat. § 29-1916 (Reissue 2016) provides in part:

> (1) Whenever the court issues an order pursuant to the provisions of sections 29-1912 and 29-1913, the court may condition its order by requiring the defendant to

grant the prosecution like access to comparable items or information included within the defendant's request which:

(a) Are in the possession, custody, or control of the defendant;

(b) The defendant intends to produce at the trial; and

(c) Are material to the preparation of the prosecution's case.

Williams argues that since he did not request the names of the State's witnesses in his motion for discovery, he was not obligated to disclose any names of witnesses he planned to call. His argument is largely founded on the case of *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998). In *Woods*, the Supreme Court affirmed as modified the Nebraska Court of Appeals' reversal of a conviction wherein the trial court had required the defendant to disclose the names of alibi witnesses prior to trial. See *State v. Woods*, 6 Neb. App. 829, 577 N.W.2d 564 (1998). The Supreme Court noted that the defendant did not seek the names of the State's witnesses in the defendant's discovery requests. As such, the court found that the reciprocal discovery provisions of § 29-1916 provided no basis for the trial court's order that the defendant be required to disclose his witnesses.

In this case, the district court rejected Williams' argument. In its decision, the district court first noted that in Williams' motion for depositions, he requested "an extensive amount of information pertaining to possible witnesses of the State." While that motion is not in our record, the district court quoted a paragraph of the motion as stating, "'Evidence which is highly complex, such as intricate mechanical or chemical evidence or prospective testimony from an expert witness, when such evidence would be better understood, or eventually rebutted, by availability of information before trial . . . .'" The court then noted that this motion for depositions was granted. The district court further noted that in its prior order as to Williams' discovery motion pursuant to § 29-1912, reciprocal discovery

was ordered. The district court then concluded that the State's request was essentially identical to Williams' request made in his motion for depositions. As such, reciprocal discovery as previously ordered required Williams to grant like access to his expert as was previously given to him as to the State's witnesses.

[3,4] While our rationale differs from that of the district court, we agree with its ultimate decision. By its terms, § 29-1916 provides only reciprocal discovery to the State as to orders for discovery entered pursuant to §§ 29-1912 and 29-1913. A motion for deposition is filed pursuant to Neb. Rev. Stat. § 29-1917 (Reissue 2016). However, unlike general discovery, a motion for deposition can be filed by either party to a criminal case. The State's ability to take the deposition of a defense witness is not dependent on the defense first taking depositions of prosecution witnesses. We note that Williams motion for depositions is not in our record. Therefore, it is difficult to discern whether the motion somehow goes beyond the parameters of § 29-1917 and is in essence a request for the identification of witnesses which would place it under § 29-1912 as apparently found by the district court.

What is clear is that this is not a case where defense counsel had not identified their expert witness to the State. According to the motion, counsel for Williams provided the State with Belloto's resume on May 31, 2017. Therefore, unlike the scenario in *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998), this is not a case where the State was seeking to force Williams to divulge the name of a witness. Rather, the State was trying to find out what it is that the identified witness would testify about. In his motion for discovery, Williams requested:

> (e) The results and reports of physical or mental examinations, and scientific tests, or experiments made in connection with this particular case, or copies thereof; [and]
>
> (f) Documents, papers, books, accounts, letters, photographs, objects, or other tangible things of whatsoever

kind or nature which could be used as evidence by the prosecuting authority.

These requests are quite broad, and reciprocal discovery was granted to the State as to each of them.

Belloto's resume reveals that he holds several graduate degrees, including a Ph.D. in pharmacy. He also holds certifications with respect to several instruments used to measure alcohol in the breath, including the DataMaster machine—the instrument used in this case—and had made numerous presentations to attorney groups regarding alcohol and drug testing as it relates to driving under the influence cases. As such, we cannot find error in the district court's conclusion that Williams should provide any report generated by his expert that is in defense counsel's possession as that report would clearly fall within the parameters of Williams' discovery requests. Therefore, Williams had the affirmative obligation to turn over any such report pursuant to the prior order of the district court requiring him to provide reciprocal discovery to the State.

In addition, the district court did not err by giving the State the option to depose Belloto. The State's motion in limine sought disclosure of Belloto's opinions and the data upon which they were based. Under § 29-1917, the court may order the taking of a deposition when it finds the testimony of the witness may be material or relevant to the issue to be determined at the trial of the offense or may be of assistance to the parties in the preparation of their respective cases. Here, both justifications exist. While we recognize that the State's motion in limine in this case did not specifically seek to depose Belloto, it did seek information as to his opinions and the basis for those opinions. Consequently, there was no error in giving the State the ability to depose a witness already disclosed to them.

Finally, we note that even if the district court's order was considered to be error, such error was harmless. The record reveals that no report authored by Belloto existed or was

produced. No deposition or interview of Belloto took place. Rather, defense counsel provided a one-paragraph letter to the prosecutor which identified the topics about which Belloto would testify and the underlying materials upon which he would rely 4 days prior to trial. This disclosure falls far short of the "complete explanation of the subject matter upon which his expert will testify" ordered by the court. The substance of the disclosure tells the prosecutor that Belloto "will discuss the reliability of the DataMaster" and "the problems with the test" conducted. This information provides little more than could be surmised by a perusal of Belloto's resume, which Williams had voluntarily disclosed. Moreover, the materials identified upon which Belloto would opine were materials previously provided to defense counsel by the State. The State called as witnesses two technicians, one who administered the breath test and one who maintained the breath testing equipment. While testimony was adduced from these witnesses as to whether the equipment was functioning properly so as to receive an accurate result, no expert was called either during the State's case in chief or in rebuttal to specifically rebut the testimony of Belloto. As such, we cannot see how Williams' case was harmed. Accordingly, we find that even if we were to find that the court erred in requiring disclosure of Belloto's expected testimony, such requirement would be harmless error given the record before us.

### 2. Admission of Expert Calculations and Summaries

#### (a) Standard of Review

[5] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

(b) Analysis

Williams next contends the district court erred in improperly admitting hearsay evidence in the form of Ruth's expert calculations and summaries, namely exhibits 139 through 141, 143 through 147, and 150, over objection during trial. In response, the State argues that Ruth's calculations and summaries were not hearsay evidence because they did not contain Ruth's opinions but only demonstrated the data and calculations upon which his opinions were based. Alternatively, the State argues such admission was harmless error.

[6,7] Hearsay is an out-of-court statement made by a human declarant that is offered in evidence to prove the truth of the matter asserted. See Neb. Rev. Stat. § 27-801 (Reissue 2016). See, also, *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010). Generally, hearsay is inadmissible except as provided by a recognized exception to the rule against hearsay. See Neb. Rev. Stat. §§ 27-802 through 27-804 (Reissue 2016).

Williams claims that the exhibits received all constituted hearsay. Williams relies on the case of *State v. Whitlock*, 262 Neb. 615, 634 N.W.2d 480 (2001). *Whitlock* involved a condemnation action brought by the State. At trial, the court received the full appraisal report and supplemental report of the defendant's appraiser and allowed the reports to go to the jury during deliberations. The Nebraska Supreme Court reversed the judgment and remanded the cause for a new trial, finding that allowing the reports to go to the jury "essentially amounted to a continued and more thorough testimony of his opinion during jury deliberations, without the benefit of cross-examination." *Id*. at 620, 634 N.W.2d at 484. The court noted that the expert's testimony on certain aspects of the appraisal were "superficial at best." *Id*. at 619, 634 N.W.2d at 484. The report was much more detailed than the testimony and contained photographs and maps for which no foundation was laid. As such, the court found that the report constituted inadmissible hearsay and should not have been provided to the jury.

In the instant case, Williams specifically complains of the admission of nine exhibits. Exhibits 139 and 140 are graphs taken from the crash data retrieval report that show the pickup truck's speed, brake activation, accelerator rate, "[e]ngine RPM," and precrash data status during the 4.4 seconds leading to impact. This graph is included in exhibits 137 and 138, which were received without objection. However, on exhibits 139 and 140, Ruth replaced the information found in some boxes of the graph with "RPM" data which tells him that the speed was higher and the pickup truck was accelerating during the first few seconds measured then slowed in the last 2 seconds. In his testimony, he explained that the recorder will only record a maximum speed of 78.3 miles per hour regardless of how fast the vehicle was traveling. Therefore, his testimony regarding acceleration and deceleration was noted into exhibits 139 and 140. Exhibits 141 and 143 through 147 all display speed calculations primarily at impact according to the various methods of calculation that he could perform based on the data retrieved from the pickup truck and the measurements taken at the crash scene. Exhibit 150 depicts the "EDR" data on a "Google Earth" photograph of the crash site.

For the most part, the exhibits display the data Ruth utilized to make his computations, the formulas used to compute the pickup truck's speed using three different sets of data, and then the resulting estimate of speed. His ultimate range of speed results from a combination of the three separate computations made and is recorded on exhibit 145. The testimony fully explained the information listed on the exhibits. Therefore, unlike the reports received in *State v. Whitlock, supra*, nothing exists in the exhibits herein that was not fully discussed in Ruth's testimony. While there is some level of opinion evidence embedded in the exhibits, they primarily serve as aids which demonstrate how Ruth reached his ultimate conclusion, and in the case of exhibit 150, they illustrate the distance traveled by Williams' pickup truck in the seconds leading up to the crash. Therefore, we view the exhibits as

being more akin to test results that display the raw data and then show the methodology utilized to generate a result.

As such, the vast majority of the information contained in the exhibits—the raw data and formulas—were not offered for the truth of the matter asserted but were offered for the purpose of demonstrating the information and analysis used by Ruth in reaching his conclusions. Accordingly, those portions of the exhibits are not hearsay.

[8,9] To the extent that some level of opinion exists in the exhibits, we find that those opinions were admissible as demonstrative evidence. Demonstrative exhibits are admissible if they supplement a witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial. *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009) (affirming admissibility of PowerPoint presentation that included several diagrams, photographs, and videos illustrating medical terms and concepts). Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case. *Id*. In this case, we find that the exhibits in question were supplemental to Ruth's spoken description of the transpired event, clarified an important issue in the case, and were more probative than prejudicial. We again note that no conclusion exists in the exhibits that was not fully explained in the testimony.

[10,11] We are mindful however that demonstrative exhibits are not automatically sent to the jury room to be utilized in deliberations. However, a trial judge may exercise his or her broad discretion to allow or disallow the use of demonstrative exhibits during jury deliberations. *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013). Here, the exhibits in question were received without qualification. Therefore, no limiting instruction was given to the jury as to how the exhibits should be considered. While the cautious approach at trial may have been to receive the exhibits at least in part on a demonstrative basis only and give a limiting instruction, we find that no harm resulted from the district court's approach. As stated,

the majority of the information in the exhibits was not hearsay. Any opinion evidence was cumulative to the testimony. Moreover, there was significant further evidence adduced during the course of trial which established that Williams was traveling at a high rate of speed at the time of the impact. Even if admitted in error, where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. See *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000). As such, we find that Williams suffered no prejudice as a result of the admission of exhibits 139 through 141, 143 through 147, and 150.

### 3. Admission of Jailhouse Telephone Call

#### (a) Standard of Review

[12,13] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Russell*, 292 Neb. 501, 874 N.W.2d 8 (2016). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*.

#### (b) Analysis

Williams assigns the district court erred by admitting the entirety of a recorded telephone call he made to his wife from jail on the night of the accident over his objection. Williams contends specific portions of this call relating to the results of his breath test and the victims' injuries constitute inadmissible hearsay. In contrast, the State argues the complained of portions of the call were admissible nonhearsay evidence because they were not offered for their truth or, alternatively, their admission constitutes harmless error because they were

cumulative of other properly admitted testimony. We agree with the State's position.

[14,15] If an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay. *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010). See § 27-801(3). A trial court should identify the specific nonhearsay purpose for which the making of a statement is relevant and probative. *State v. Baker, supra*.

In this matter, Williams complains of a handful of statements contained within a recorded telephone call that lasted 10½ minutes. First, Williams' statements regarding the results of his breath test, which were prompted by his wife's question, were not offered by the State for their truth because they were not accurate. On the recorded call, Williams references breath test scores of 1.2 and 1.4. The technician who administered Williams' breath test testified that Williams' test result was actually .134. Accordingly, Williams' telephonic statements regarding his breath test score were admissible nonhearsay evidence. Additionally, Williams' telephonic statements regarding the victims' injuries were also not offered for their truth, because Williams knew little about the particularities of the injuries and expressed uncertainty regarding the victims' conditions. Because the complained-of statements on the recorded call were not offered for the truth of the matter asserted, their admission was proper.

[16] Even assuming Williams' complained-of statements were improperly admitted, we determine any error was harmless as ample evidence was adduced regarding the subject matter of those statements from other sources. Thus, an error is harmless when cumulative of other properly admitted evidence. In particular, Williams' statements on the telephone regarding the results of his breath test were cumulative of the testimony of the technician who administered Williams' breath test. That technician testified that Williams' test result was .134 of a gram of alcohol per 210 liters of breath, which comports with exhibit 105, a copy of the Omaha Police Department's

"INFRARED ABSORPTION Checklist Technique" that the technician who administered Williams' breath test completed on the night in question.

Williams' statements on the telephone regarding the victims' injuries were also cumulative as multiple witnesses testified to the nature of the victims' injuries. Most notably, Sorenson's treating physician testified that Sorenson had burns to her face and hands and a ruptured spleen due to the accident. Sorenson also testified that she sustained injuries to her spleen and burns to her face and hands. Additionally, Gentile testified to seeing the three victims' injuries when he first arrived at the scene. Accordingly, even if admission of the complained-of statements constituted error, no harm resulted to Williams.

### 4. Striking Juror for Cause

#### (a) Standard of Review

[17,18] Retention or rejection of a juror is a matter of discretion with the trial court. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998). Thus, the standard of review in a case involving a motion to dismiss a juror is whether the trial court abused its discretion. *Id*.

#### (b) Analysis

Williams contends that a prospective juror ought to have been stricken for cause due to his familiarity with this case's underlying facts. Accordingly, Williams argues the district court erred in denying his motion to strike that prospective juror. The State argues that the prospective juror in question was not biased by his knowledge of the case, meaning there was no ground to remove him for cause. Additionally, the State argues that Williams was not prejudiced because the objectionable prospective juror did not actually sit on the jury. We find that the district court did not abuse its discretion by overruling Williams' motion to strike the juror for cause.

[19,20] Through the use of peremptory challenges or challenges for cause, parties can secure an impartial jury and avoid

including disqualified persons. See *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), *modified on denial of rehearing* 261 Neb. 623, 633 N.W.2d 890. The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017). Jurors who form or express opinions regarding an accused's guilt based on witness accounts of the crime must be excused for cause. See, Neb. Rev. Stat. § 29-2006 (Supp. 2017); *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). However, jurors whose source of information is from newspaper reports, hearsay, or rumor can be retained if the court is satisfied that such juror can render an impartial verdict based upon the law and the evidence adduced. See, § 29-2006; *State v. Galindo, supra*.

[21-23] Even the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges. *State v. Galindo, supra*. Appellate courts ought to defer to the trial court's judgment on a motion to strike for cause, because trial courts are in the best position to assess the venire's demeanor. See *id*. Notably, the court in *State v. Galindo, supra*, only considered arguments regarding 2 of the 19 potential jurors who the defendant claimed ought to have been stricken for cause because only those 2 potential jurors actually ended up seated on the jury. The complaining party must prove it used all its peremptory challenges and would have used a challenge to remove other biased jurors if not for the court's error. See *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007).

In the present matter, during the State's voir dire, the prospective juror at issue stated that he was familiar with the facts of this case. The prospective juror also stated he had served on a civil jury some time ago and had practiced law for many years, trying mostly civil cases and one shoplifting case in which he served as defense counsel.

In chambers, and with counsel and Williams present, the prospective juror in question recounted the particular facts of this matter that he remembered, stating he "followed it pretty closely." For example, the prospective juror recalled the area of the accident, basic descriptions of the parties involved, and basic facts of the accident. Upon questioning, he confirmed he was "going off [his] memory of some news reports" that he read or watched at the time. When asked by the State's attorney, the prospective juror confirmed he would follow the court's instructions and make a decision based only on the evidence presented in court.

Williams' counsel then questioned the prospective juror, who acknowledged discussing the accident with other people when it happened and stated that "it sounded pretty nasty" but denied having already made up his mind. Upon further questioning by Williams' counsel, the prospective juror agreed that separating what he already knew from the evidence was possibly difficult and expanded by saying, "I don't think that anybody can separate their life's experience from — from what they hear. You are going to have some opinions you come in with."

After Williams moved to strike this prospective juror for cause, the court inquired further, revealing that the prospective juror had practiced law for some 25 years. The court also noted that no jurors have "100 percent clean minds" and sought to determine whether the prospective juror would deliberate and decide the matter based solely on the evidence presented in court. The prospective juror stated, "Based upon my years practicing law, I would hope that all my jurors would look at the evidence and not anything else, and I would do my darnedest to do the same thing." Satisfied, the court overruled Williams' motion to strike the prospective juror for cause. The prospective juror in question was subsequently excused at the conclusion of the jury selection process after the parties exercised their peremptory strikes.

We find no abuse of discretion by the district court. Although additional questions could have been asked, we are

satisfied that the prospective juror's answers showed a clear intent and capability to be an impartial juror in this matter. After practicing law for some 25 years, the prospective juror's statements show that he recognized the practical reality that no person enters the jury box devoid of personal experiences. Even though the prospective juror's experiences happened to include reading publications about the accident for which Williams was charged, the prospective juror repeatedly stated his intent to consider only the evidence offered in the courtroom. It is also clear that the prospective juror intended to conduct himself as he expected all jurors would, judging Williams solely on the evidence offered in court and nothing else. As such, particularly given our standard of review and recognizing that the district court had the opportunity to observe the prospective juror's demeanor and the manner in which he answered questions, we find the court did not err in overruling Williams' motion to strike the prospective juror in question.

5. Motions to Suppress

(a) Standard of Review

[24] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Petsch*, 300 Neb. 401, 914 N.W.2d 448 (2018); *State v. Botts*, 299 Neb. 806, 910 N.W.2d 779 (2018). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Petsch, supra*; *State v. Botts, supra*.

[25] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we apply a

two-part standard of review. *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). With regard to historical facts, we review the trial court's findings for clear error. *Id*. Whether those facts suffice to meet the constitutional standards, however, is a question of law which we review independently of the trial court's determination. *Id*.

[26] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

(b) Arrest of Williams

[27] Before engaging in our analysis of the issues presented regarding Williams' motions to suppress, we must pause to note that our analysis is hampered by the brevity and absence of more particularized findings made by the district court in its order overruling Williams' motion. "[D]istrict courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress." *State v. Osborn*, 250 Neb. 57, 67, 547 N.W.2d 139, 145 (1996). While the degree of specificity can vary from case to case and while some very brief general findings were made in this case, to the degree the district court can be more specific in its findings, our review of its ultimate disposition of the motion is aided.

Williams contends the court erred in denying his motion to suppress evidence arising from his arrest because the arrest was not supported by probable cause. In response, the State argues there was probable cause that Williams committed multiple crimes, which was sufficient to support Williams' arrest.

[28-31] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the state. *State v. Pester*, 294 Neb. 995, 885 N.W.2d 713 (2016). An

arrest constitutes a seizure that must be justified by probable cause to believe that a suspect has committed or is committing a crime. *Id.* Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *State v. Botts*, 299 Neb. 806, 910 N.W.2d 779 (2018). Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *Id*. An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances. *Id*.

Williams' arrest was supported by probable cause and therefore does not warrant suppression. Neither party disputes that Blice placed Williams under arrest. Williams' contention that this arrest was not supported by probable cause flies in the face of ample circumstances giving rise to probable cause for officers to arrest him.

At the hearing on Williams' motion to suppress, the State called Blice, who responded to the accident in this matter. He testified to investigating intoxicated drivers during the course of his time with the Omaha Police Department. He further testified that general signs of intoxication include poor balance, an appearance of confusion, red or watery eyes, slurred or thick speech, and an odor of alcoholic beverages.

Blice testified that he and Gentile were dispatched to the scene of the accident at 7:14 p.m. Upon arrival, he first saw the pickup truck on its side near 52d and Blondo Streets and a second vehicle on fire approximately one block south. The area wherein the accident took place was residential. Upon exiting his police cruiser, Blice walked to the area of the second vehicle and observed that it had been virtually split in half by the impact. He testified that the speed limit at that location was 30 miles per hour, but that from his assessment of the scene, the collision had to have occurred at a much higher speed.

After ensuring there were no occupants left inside the second vehicle, Blice walked back toward the pickup truck, noticing the presence of full beer cans and ice from the impact area all the way back to the pickup truck. Once back to the pickup truck, Blice spoke with witnesses who had heard the crash and presumably arrived very soon after. The witnesses described observing the pickup truck driver get out of his vehicle and walk to the north away from the scene. As Blice continued speaking with witnesses, they pointed behind him and identified Williams, who was walking around, as the pickup truck driver. By that point, Williams was located to the south of Blice, between the two vehicles. When Blice made contact with Williams, he observed that Williams appeared disoriented, smelled of alcohol, and exhibited slurred speech and watery eyes. Williams acknowledged immediately that he was the driver of the pickup truck and was thereafter handcuffed and placed into the police cruiser.

We find that probable cause to arrest Williams existed at the time of arrest based on the totality of the facts and circumstances. Blice had probable cause to arrest Williams based on an objectively reasonable belief that Williams was driving under the influence of alcohol when involved in this accident. At the time of arrest, Williams was emitting an odor of alcoholic beverage, his eyes were bloodshot and watery, his speech was slurred and thick—all indicators of possible intoxication. Further, although Blice had not observed the accident, he knew that Williams had operated his pickup truck at a high rate of speed in a residential neighborhood sufficient to almost cut one vehicle in half and have his pickup truck roll onto its side and slide almost one block. This erratic driving behavior and lack of regard for the safety of others also supports the conclusion that probable cause existed for the arrest. Based on the totality of the facts and circumstances present, probable cause existed to believe Williams was operating a motor vehicle while under the influence of alcohol.

Moreover, Neb. Rev. Stat. § 60-697 (Cum. Supp. 2016) requires the driver of a vehicle involved in an accident to immediately stop and ascertain the identity of all persons involved; provide his name, address, and license number to the persons struck or occupying the other vehicle; and render reasonable assistance to injured persons. Given Blice's testimony that witnesses saw Williams exit the pickup truck and walk in the opposite direction of the accident scene and that officers did not locate Williams until witnesses observed and identified him, Blice had probable cause to believe Williams had left or was attempting to leave the scene of an accident.

Finding probable cause existed to support Williams' arrest, we find that the district court did not err by denying Williams' motion to suppress.

### (c) Pre-*Miranda* Statements

Williams argues that the court erred in not suppressing statements he made after being handcuffed and placed in the police cruiser, because they were elicited in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The State argues that, assuming the court erred, its error was harmless. We find that the court erred in overruling the motion to suppress Williams' responses to Blice's questions asked while at the scene in the police car, but we further find that the error was harmless.

[32-34] The *Miranda* Court adopted a set of safeguards to protect suspects during modern custodial interrogations, which have also been implemented through Nebraska courts. See *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). These safeguards are implicated whenever a person is in custody and interrogated. See *id*. A person is in custody for purposes of *Miranda* when formally arrested or otherwise restrained so as to be unable to move freely. See *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). It is undisputed that a person who is handcuffed and placed in a police cruiser's back seat is in custody. See *id*. An interrogation includes express

questioning, its functional equivalent, and any police conduct that police officers ought to know is reasonably likely to elicit incriminating responses. See *id*. An arrestee's voluntary statements, which are not the product of interrogation, are not protected under *Miranda*, however, and are therefore admissible. See *id*.

[35,36] When a custodial interrogation occurs in the absence of *Miranda*-style procedural safeguards, an arrestee's self-incriminating statements are inadmissible in court. See *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014) (holding arrestee's statements made aloud to himself while handcuffed in police cruiser before being administered *Miranda* warning were admissible because arrestee was not subject of custodial interrogation). In determining whether the State has shown the admissibility of custodial statements by the requisite degree of proof, an appellate court will accept the factual determination and credibility choices made by the trial judge unless they are clearly erroneous and, in doing so, will look to the totality of the circumstances. *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007).

[37] Even when a trial court errs in failing to suppress a statement elicited in violation of *Miranda v. Arizona, supra*, the error may be harmless and thus not require reversal on appeal. Erroneous admission of evidence is a harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Juranek, supra*. Thus, harmless error analysis focuses on the basis on which the trier of fact's verdict rested. See *id*. The proper inquiry is whether the trier of fact's verdict was certainly not attributable to the error. See *id*. See, also, *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012) (holding trial court's error in admitting arrestee's statements obtained in violation of *Miranda* principles was harmless because there was overwhelming other evidence on which jury's conviction likely rested).

In this case, Williams was certainly in custody for purposes of *Miranda v. Arizona, supra*, when he was handcuffed, placed in the back seat of Blice's police cruiser, and locked in. Additionally, Blice directly questioned Williams. This questioning constituted interrogation. As a result, Williams' responses should not have been admitted unless the evidence demonstrated that Williams was first administered a *Miranda* warning and waived his rights thereunder. The district court, whose factual determinations should be accepted unless clearly erroneous, determined that the officers solicited statements from Williams before he was read a *Miranda* warning but nonetheless found those statements to be admissible. We find, however, that the express questioning by Blice while Williams was handcuffed in the back of the police cruiser constituted a custodial interrogation without the benefit of a *Miranda* warning. Therefore, those statements, some of which were incriminating, should have been suppressed.

However, in this instance, the court's error was harmless. A review of the record shows that the substance of the inadmissible statements was also introduced to the jury through admissible evidence. In violation of *Miranda* safeguards, Blice asked basically three questions to which Williams responded. Williams stated that someone pulled in front of him and that he tried to stop, but could not do so. Williams admitted that he was driving too fast and stated he was northbound on 52d Street when the collision occurred. The substance of this inadmissible evidence was properly admitted in other forms, however, including through Williams' jailhouse telephone calls to his wife and other witness accounts of hearing the collision and viewing the accident scene. In addition, expert witness testimony was adduced as to the speed Williams' pickup truck was traveling. The inadmissible statements were therefore cumulative of other properly admitted evidence. Accordingly, while the court erred in admitting Williams' statements that were made in the absence of *Miranda* safeguards, the error was harmless and thus does not warrant reversal on appeal.

We note for the sake of completeness that Williams did make some other statements while in the police cruiser which were received in evidence. However, on our review, we find that those statements either were volunteered and not in response to questioning or were in response to Gentile's inquiries regarding whether Williams needed medical attention. No incriminating response was made to Gentile's inquiries.

### (d) Post-*Miranda* Statements

Williams contends the court erred in admitting statements he made after receiving a *Miranda* warning at the police station, arguing such post-*Miranda* statements were really made during the continuation of a custodial interrogation begun before the *Miranda* warning was administered. The State argues Williams' statements were not obtained as the result of a continuous two-step interrogation and thus were admissible. We find no error in the district court's denial of Williams' motion to suppress his post-*Miranda* statements.

[38,39] Generally, incriminating statements are admissible when elicited after officers have provided a *Miranda* warning and received the accused's voluntary waiver. See *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Courts must consider whether a *Miranda* warning, when given after an arrestee has already made incriminating statements, is sufficient to advise and convey that the arrestee may choose to stop talking even though he or she has spoken before the warning was administered. See *id*. "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id*., 542 U.S. at 611-12. Where the warning is not effective to place an arrestee in a position to make an informed choice to stop talking, there can be reason neither to accept the warning as compliant with *Miranda* nor to treat the second stage of interrogation as separate from the first, inadmissible stage. See *Missouri v. Seibert, supra*.

[40] To determine whether a midinterrogation *Miranda* warning is sufficient to warrant the admission of post-*Miranda* statements, courts should consider five factors developed by the Court in *Seibert*:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.*, 542 U.S. at 615.

In applying the *Seibert* factors, the court in *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014), held that the circumstances of the pre- and post-*Miranda* interrogations therein showed that the *Miranda* warning was effective. In particular, the court held that the accused's post-*Miranda* statements were not rendered inadmissible due to the pre-*Miranda* interrogation, because the initial interrogation consisted of only a single question that was focused on matters other than key points of the investigation. See *State v. Juranek, supra*.

[41] The court again examined and applied the *Seibert* factors in *State v. Clifton*, 296 Neb. 135, 156, 892 N.W.2d 112, 131 (2017), and held that in instances of midinterrogation *Miranda* warnings, violations under *Seibert* must include "an inculpatory prewarning statement that somehow overlaps with statements made in the postwarning interrogation." Notably, in *Clifton*, only 5 minutes of pre-*Miranda* questioning took place, and the questioning focused on information such as the spelling of the defendant's name, his address, and educational background. In fact, the defendant in *Clifton* made no incriminating statements before a *Miranda* warning was administered. Accordingly, the court in *Clifton* held that the trial court did not err in denying the defendant's motion to suppress his statements.

In this case, before administering to Williams a *Miranda* warning, Blice spoke with him while he was handcuffed and

in the back of a police cruiser shortly before 7:30 p.m. Blice asked Williams a few questions regarding what had happened, what direction he was going, and how fast he was driving when the accident occurred. The entire encounter was brief, lasting approximately a minute. Blice and Gentile then drove Williams to the police station.

After transporting Williams to the police station, Blice administered a *Miranda* warning to Williams at 8:34 p.m. as noted in the driving under the influence supplementary report and field notes form, and Williams thereafter agreed to answer Blice's interview questions. Blice testified that he typed responses into the form as Williams answered his questions. Blice asked Williams whether he was operating a vehicle, where he was headed, whether and how much he had been drinking, and whether he was ill or had any injuries. Williams answered that he was driving north to his home and that he had ingested "too many beers," that being six between 3 p.m. and 6:45 p.m. He also stated that he was feeling the effects of alcohol less at the time of the interview than at the time he was first contacted by police. He denied that he had taken any medications and stated that he did believe his drinking had affected his ability to drive safely. The interview concluded at 8:39 p.m.

Although during the pre-*Miranda* interrogation, Williams admitted to being the driver of the pickup truck that struck and injured the victims in this matter, he did not at that time mention drinking any alcohol. He merely stated the direction he was driving and that he could not stop before impact. Blice's pre-warning questions did not go to many of the key points of the investigation. Accordingly, while some of Williams' statements do overlap the two interrogations, they are not the sort of overlapping and inculpatory statements that the court in *State v. Clifton, supra*, found was necessary for a *Miranda* violation under *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

Moreover, upon evaluation of the *Seibert* factors, most of them fall in favor of admissibility in this instance. Although there was continuity of police personnel throughout Williams' pre- and post-*Miranda* warning interrogations, the interrogations took place roughly an hour apart and were conducted in different locations. Additionally, Williams' prewarning answers were cursory and devoid of detail, and the postwarning questions did not act as a mere continuation of the prewarning interrogation. While some topics were addressed during both interrogations, the postwarning questions were more detailed and focused more on Williams' alcohol consumption, which was not covered in the prewarning questions. Accordingly, under *Missouri v. Seibert, supra*, Williams' two-step interrogation did not violate *Miranda* principles. Thus, we find no error in the district court's denial of Williams' motion to suppress his post-*Miranda* statements.

## V. CONCLUSION

Having found no error or, alternatively, only harmless error in the orders and rulings challenged by Williams herein, we hereby affirm Williams' convictions.

Affirmed.